NED ALEXANDER, appellee, v. TOWN OF MONTEZUMA et al., appellants.

No. 47999.

(Reported in 51 N.W. 2d 456)

William L. Hassett, of Des Moines, for appellants.

E. W. McNeil, of Montezuma, for appellee.

BLISS, J.—The population of Montezuma in 1950 was 1460. Proceeding under chapter 407, entitled "Indebtedness", of the 1950 Code of Iowa, the electors of the defendant town, at a special election held on January 17, 1951, voted 556 to 113 in favor of the following public measure: "Shall the Town of Montezuma, Iowa, improve its Municipal Waterworks System by the construction of a water reservoir and the acquisition of a site therefor, and contract indebtedness for such purpose not exceeding $90,000.00 and issue bonds for such purpose not exceeding $90,-000.00, and levy a tax annually upon the taxable property in said Town * * * not exceeding nine mills per annum for the payment of such bonds and interest thereon?" The regularity of the election proceedings is not challenged.

On July 25, 1951, the town council, with all members present, and the mayor presiding, unanimously adopted a resolution, which, after stating: the holding of the election on January 17, 1951, on the proposition of extending and reconstructing the town's waterworks system; the statutory steps preliminary to the election; the affirmative vote in excess of sixty per cent of the votes cast; the adoption of plans and specifications and the execution of a contract for the construction of the improvement at a cost of $90,000, ordered the issuance of ninety waterworks bonds in denominations of $1000 each, bearing date of August 1, 1951, with interest at a rate dependent upon the successful bid. The bonds, numbered from one to ninety, were to mature in their

numerical order, in each year from 1953 to 1970, inclusive. For the payment of the principal and interest of the bonds, the resolution ordered the levy of a tax annually in the years 1951 to 1969, inclusive, in amounts varying from $6200 to $7000.

On July 25, 1951, plaintiff filed his petition, alleging the matters, in substance, as stated above, and that: any bonds issued pursuant to said resolution, being under chapter 407, Code of 1950, would be without authority and void, since the issuance of such bonds, and any tax levied to pay them, is governed and controlled, since July 4, 1951, by chapter 159 of the Laws of the Fifty-fourth General Assembly; and section 12 of said chapter provides for a levy of "not to exceed five (5) mills on the dollar on all taxable property within the corporate limits" of the defendant town, for the payment of the proposed bonds; and the annual levy of a nine-mill tax, as provided in the resolution, wrongfully exceeds the statutory five-mill limit, and will annually exhaust the proceeds thereof, and leave nothing to pay the cost of street lighting, and other items specified in said section 12.

Defendants filed their answer on July 28, 1951, admitting in Count I thereof the allegations of the petition as to what had been done; and the allegation that chapter 159 of the session laws of the Fifty-fourth General Assembly became effective on July 4, 1951, but denied that said Act invalidated the proposed bonds by any amendment to, or modification of, chapter 407, Code of 1950, pursuant to which the bonds were voted and authorized by the electors, who also by their vote authorized a tax of nine mills on the dollar to pay the principal and interest of said bonds, and that the annual tax levy, authorized by the resolution, is substantially less than that authorized by the vote of the electors.

Because of the grounds of our opinion we do not set out or discuss Count II of defendants' answer. Plaintiff denied the affirmative allegations of the answer in his reply.

Trial began on July 31, 1951. It was stipulated that the bonds authorized in the resolution had not been sold or issued; that the value of all of the taxable property in Montezuma, as of January 1, 1951, was $1,118,525, and that one mill of taxation would raise $1,118.52; and that under a contract between the town and the municipal light plant of the town, the town paid the light plant $983.68 annually for street lighting. Copies of

the resolution and other documents referred to above were introduced by agreement. Defendants also introduced a true copy of a report of the Municipal Statutes Study Committee authorized by a Joint Resolution of the Fifty-third General Assembly, which appears as chapter 308 of its session laws, approved May 5, 1949. The official report of this six-member committee was made to the Governor of the State of Iowa, about November 15, 1950.

Since the determination of this appeal is largely a matter of statutory construction, some further reference to this study and report is made. Section 2 of the Joint Resolution states that: "It shall be the duty of the committee to make a comprehensive study of the laws relating to the construction and financing of public improvements within municipalities, and other laws relating to the conduct of the business of the municipalities, and to make such recommendations as it sees fit as to the codification, simplification, and modification of such laws to the end that the business of municipalities may be more expeditiously and more efficiently conducted."

The committee had the co-operation of the attorney general and his staff and other departments of state government, and counseled with many municipal officers. It was directed by the Joint Resolution to include in its report drafts of proposed bills. Copies of all of these were sent to the Governor of Iowa and to the members of the Fifty-fourth General Assembly. Senate File 212 which is Chapter 159 of the Laws of the Fifty-fourth General Assembly, the statute involved herein, is the fruition of the study and investigation and report and recommendations of this committee.

After stressing the great number of people in Iowa whose welfare in many ways depends upon the proper functioning of municipal government, and the community problems which modern development has placed on municipal officials, the report states:

"It is most appropriate, therefore, that we critically review the Iowa statutes and recommend such changes as are needed to meet the conditions of today. Our municipalities and their officials should not be handicapped in the conduct of the business of the municipalities by obsolete laws. * * * The need for reviewing, clarifying, simplifying, and modernizing the pro-

cedural laws governing incorporated municipalities has long been realized by municipal officials and legislators. * * * As a result of its studies and conferences, the committee agreed:

"1. That there is neither need nor justification for the 164 municipal funds that are now authorized by the laws of Iowa. * * *.

"3. *That municipal corporations should be given broad latitude in determining the amount needed to finance the several activities that fall within a function of municipal government. There is a wide difference in the local conditions in the 935 municipal corporations of Iowa. The state should not specify arbitrary limitations on tax levies for specific purposes that are so low that it is not possible for municipal officials to successfully cope with their local problems.*

"4. *The taxpayers interests can be protected by specifying a reasonable maximum over-all limitation on total millage levies, and by retaining all existing controls in the form of public hearings at the time that budgets and levies are determined for the ensuing fiscal year.*

"5. *That no arbitrary limitations should be imposed on tax levies required either for servicing municipal indebtedness, or* for financing the municipal corporation's share of the cost of retirement and pension plans for municipal employees, as authorized by state law. [Italics ours.]

"Bill No. 13, Part II, provides for changes in and amendments to existing laws that are needed to carry out the committee's recommendations * * *.

"In lieu of the 164 municipal funds now provided by statute, Bill No. 13 makes provision for nine funds as follows: General, Street, Public Safety, Sanitation, Municipal Enterprises, Recreation, Utilities, Debt Service, and Trust and Agency Fund."

The task which the Fifty-third General Assembly placed on the committee was a most difficult one and the labor of attempting to perform it was very great. Several chapters of the Iowa Code and scores of sections deal with towns and cities of different classes and the numerous matters connected with them. Their functions, duties and responsibilities are many and burdensome and each of them requires the contracting of indebtedness, which must be paid by the levying of taxes, and from other sources of

income. These municipal obligations follow a general pattern yet the problems of individual cities and towns may vary greatly and it is difficult to enact statutes and to fix the millage of tax levies to adequately meet the needs of each municipality in many situations. The report and recommendations of the committee indicate this.

Senate File 212 appears as chapter 159 in the Laws of the Fifty-fourth General Assembly, and is entitled "Municipal Revenue", "AN ACT relating to taxation and other sources of municipal revenue, and to repeal chapter four hundred four (404) of the Code relating thereto and enact a substitute therefor, and to repeal * * * and to amend certain sections of the Code relating thereto." It also repeals chapter 406 (by section 87), and refers to, amends, and repeals over one hundred other Code sections. We have italicized above some propositions upon which the committee reported that its members had agreed. The Act as passed by the Fifty-fourth General Assembly indicates its intention to effect these objects.

In repealing chapter 404 the Act does not eliminate any taxes, but reduces the number of functional funds for which taxes are to be levied, and groups the taxes and the various kindred purposes for which they are levied into nine specific funds, approximately as set out in the committee report. Section 1 of the Act provides that municipal corporations have power to cause to be levied the taxes provided in the Act, "and such other taxes and special assessments as are specifically provided by law except as modified by the provisions of this chapter."

Section 2 of the Act is as follows: "Functional funds—maximum levy. Municipal corporations shall have power to establish functional funds provided by sections six (6) to twelve (12), inclusive, of this chapter and to cause taxes to be levied on all taxable property within the corporate limits according to the needs of the particular corporation for each particular function, not to exceed the maximum millage rate designated in said sections for any function, and in the aggregate not to exceed thirty mills on the dollar in any tax year for all of said functions, and they shall *also* have power to establish *a debt service fund,* and trust or agency funds." (Italics ours.)

Section 4 provides: "Allocation of revenue. Municipal corporations shall, at the first meeting of the council after January 1, allocate by resolution the estimated revenue from all levies to the purposes authorized by law *and shall allocate sufficient revenue to the debt service fund from other funds or sources to pay all bonds and interest thereon as they become due.* Said allocations shall also include receipts from sources other than taxation, estimated unincumbered balances from the previous year, and any contemplated transfer of funds. * * *."

Section 5 provides: "Flexibility provisions. Municipal corporations may fit their income to their needs in the following ways:" Then follow five subsections authorizing other allocations, and also transfers within functional funds, and between functional funds. Subsection 5 states: "By transfers of surplus from the *debt service fund,* as provided by section nineteen (19) of this chapter, subject, however, to the approval of the state comptroller. Before such approval is given, the state comptroller shall assure himself that good business practice has been followed and that there is reasonable assurance of prompt, regular payment of the debt in the future." (Italics ours.)

The seven functional funds stated in sections 6 to 12, inclusive, and the maximum tax millage on the dollar of all taxable property are: Section 6, General government, with 8 subsections (7 mills); section 7, Street fund, with 13 subsections (7 mills); section 8, Public Safety fund, with 7 subsections (12 mills); section 9, Sanitation fund, with 8 subsections (7 mills); section 10, Municipal enterprises fund, with 13 subsections (10 mills); section 11, Recreation fund, with 10 subsections (5 mills); section 12, Utilities fund, with 8 subsections (5 mills). The total millage for these seven funds is 53 mills, but, as noted above, section 2 provides that the aggregate levy for the seven funds shall not exceed 30 mills in any one year.

Section 13 provides for the Debt Service fund, as follows: "Municipal corporations shall establish a debt service fund and shall cause to be levied for said fund a tax *in such number of mills* on the dollar on all taxable property within the corporate limits, *as is necessary for the following purposes:*

"1. To pay all judgments against the municipal corporation

other than those specifically authorized by law to be paid from other funds;

"2. To pay the interest accruing on funding and refunding bonds outstanding, and such proportion of the principal that at the end of the first quarter of the term of any issue of bonds the sum raised shall equal at least twenty percent of the bonds issued; at the end of the second quarter of said term at least forty percent of said amount; at the end of the third quarter of said term at least sixty-five percent of said amount; and on or before the date of maturity of said bonds a sum equal to the whole amount of unpaid interest and principal;

"3. For such other purposes relating to debt service as are specifically authorized by law;

"It shall be the duty of the council to allocate the proceeds of the tax herein provided to accomplish the purposes herein enumerated." (Italics ours.)

We do not find the term "debt service fund" mentioned in other statutes pertaining to municipal taxation, indebtedness or financing, except as it has been placed there by chapter 159 of the Laws of the Fifty-fourth General Assembly. It was apparently by this debt service fund that the committee and the legislature intended to give municipal authorities broader latitude in determining the amounts needed to finance their functions and activities. It is a flexible fund, in that it is not limited to a specific millage tax levy by any provision of said chapter 159. As stated in section 13, the tax is to be "in such number of mills * * * as is necessary" for its purposes. It is provided in section 2 that it is in addition to the funds provided for in sections 6 to 12, inclusive, which have maximum millage limits. This also appears from section 18.

Section 20 provides: "Surplus of tax. When a tax has been levied by any municipal corporation for the debt service fund, such tax shall not be held invalid if the rate of tax raises an amount in excess of that sought for specific purposes. Money so raised shall be held in the debt service fund until all debts except those evidenced by revenue bonds are discharged and any surplus remaining thereafter may be transferred to any other fund or funds as the council by resolution may direct."

I. The defendants rely upon but one proposition for reversal which they state thus: "The trial court erred in holding that section 12 of Senate File 212 controlled and limited the levy of the tax to pay the bonds; and in rejecting defendants' claim that these bonds are payable out of the debt service fund established by section 13 of said Act, which authorizes an unlimited levy to pay the same."

There is no dispute about the facts. The question for determination is one of law. There are two "functional funds" involved, section 12, the Utilities fund, and section 13, the Debt Service fund. Plaintiff contends that section 12 alone controls and that section 13 is of no aid to defendants.

Section 12 provides: "Utilities. Municipal corporations shall have power to annually cause to be levied for a fund to be known as the utilities fund a tax not to exceed five (5) mills on the dollar on all taxable property within the corporate limits and allocate the proceeds thereof to be used for the following purposes:

"1. If the authorized rates or rentals are insufficient to meet the expenses of running, operating, and repairing the waterworks, gas or electric plant, or power plant owned or operated by the municipal corporation, and the interest on any bonds issued to pay for the *construction, reconstruction, repair,* or *extension* of such works, such amount as may be necessary to make up the deficiency;

"2. To pay the principal of bonds issued for the *construction* or *purchase* of waterworks, gasworks, electric light or power plants;

"3. In cities and towns owning and operating a light plant to pay for electricity for ·street lighting and other municipal purposes; * * *." Other subsections are not material. (Italics ours.)

Under subsection 1 the tax might be used, under the specified condition, to pay *interest* on the Montezuma bonds. In subsection 2 the tax is authorized to pay *principal* of bonds issued for the *construction* or *purchase* of waterworks. A question might arise whether under subsection 2 any part of the utilities fund of section 12 could be subjected to or used to pay the prin-

cipal of the bonds involved here. We hold there would be no reasonable basis for such query. The question submitted to the electors was for the construction of a water reservoir and the acquisition of a site. The improvement was new construction and acquisition, and fairly within subsection 2.

It appears to this court that section 13 was intended to, and does expressly, provide for the use of the debt service fund in the payment of both principal and interest of the bonds in controversy. Turning back to that section, as set out herein, subsection 1 has no application. Subsection 2 refers to "funding and refunding bonds", which are the subject matter of chapter 408 of the 1950 Code, and makes both the principal and interest of said bonds payable out of the debt service fund. Section 408.10 of said chapter provided that cities and towns may anticipate the collection of taxes authorized to be levied for funds for the purchase of cemeteries, dump grounds, and funds for grading, city improvements, district sewers, equipping fire departments, sewer outlets, purifying plants, paving roadways, flood protection, and parking lots. Section 18 of chapter 159 (54th G. A.) provides that the debt service fund may be used in financing these bonds, and section 91 of said chapter repealed section 408.14 pertaining to such bonds, and enacted instead: "Said certificates and bonds and interest thereon shall be paid from allocations of the debt service fund." Section 408.10, Code 1950, was also amended by section 89 of said chapter 159 (54th G. A.).

The payment of both principal and interest of such bonds as are involved in this appeal, out of the debt service fund, is provided in subsection 3 of the Debt Service section (13), which reads: "For such other purposes relating to debt service as are specifically authorized by law." The special authorization is found in section 88 of chapter 159 (54th G.A.) which amends section 407.14, Code, 1950. Chapter 407 of that Code has not been repealed by chapter 159 (54th G.A.).

Section 407.3 states: "Cities and towns when authorized to acquire the following named public utilities and other improvements may incur indebtedness for the purpose of: 1. Purchasing, erecting, extending, reconstructing, or maintaining and operating *waterworks* * * *. [Italics ours.] 2. Purchasing or erecting garbage disposal plants." 3. Equipping community cen-

ter houses and recreation grounds. 4. Establishing juvenile playgrounds, swimming pools and recreation centers thereon. 5. Constructing, purchasing, remodeling city and town halls, jails, police stations or fire stations. 6. Public library. 7. Hospitals. 8. Dams across streams. These extraordinary purposes must be authorized by the electors. The defendants proceeded under this chapter.

Section 407.14 provided: "Payment of bonds. Bonds for garbage disposal plants shall be paid from the general fund of the city or town, but other bonds shall be paid from the particular fund created therefor." Section 88 of chapter 159 amended section 407.14 by striking the word "general" and substituting the word "sanitation", and by striking the words "particular fund created therefor" and substituting the words "debt service fund", so that the amended section 407.14, now reads: "Payment of bonds. Bonds for garbage disposal plants shall be paid from the sanitation fund of the city or town, *but other bonds shall be paid from the debt service fund.*" (Italics ours.)

Garbage disposal plants were provided for in subsection 2 of section 407.3. Extending, constructing or reconstructing waterworks, as involved in this appeal, were provided for in subsection 1. By chapter 407 (Code), and by chapter 159 of the Laws of the Fifty-fourth General Assembly it is now provided that bonds issued by cities and towns for indebtedness incurred for improvements named in subsection 1 and also those named in subsections 3, 4, 5, 6, 7 and 8 of section 407.3 of the Code of 1950 may be paid for out of the debt service fund authorized and established by said chapter 159, supra.

Plaintiff stresses subsection 5 of section 25 of chapter 159, which states: "No other statute whether heretofore or hereafter enacted relating to the taxing power of municipal corporations shall be construed to increase the limits on millage levies established in section two (2) and sections six (6) through twelve (12) of this Act." The weakness of this contention is that the use of the debt service fund to pay bonds of the type involved in this appeal is authorized, not by statutes heretofore or hereafter enacted, but by the provisions of chapter 159 itself. The quoted sentence does not mention the debt service fund.

It is our conclusion that the resolution of the council of the

262

town of Montezuma of July 25, 1951, authorizing the issuance of $90,000 of waterworks bonds as provided in the public measure adopted by the electors in the special election of January 17, 1951, was and is valid, and that taxes collected from a levy not exceeding nine mills may be allocated by the council to the Utilities fund and to the Debt Service fund in such portions as in its judgment the circumstances warrant, to be used for the payment of both principal and interest of the waterworks bonds issued.

The judgment and decree of the district court is reversed and the cause is remanded to it for entry of judgment and decree in conformity herewith.—Reversed and remanded.

All JUSTICES concur except SMITH, J., not sitting.