John DOE et al., Appellants,

v.

Robert D. RAY, Governor of the State of Iowa, et al., Appellees.

No. 2–59856.

Supreme Court of Iowa.

March 16, 1977.

Gordon E. Allen, Leslie Babich, Mark W. Bennett, and Robert J. Rhudy, Des Moines, for appellants.

Richard C. Turner, Atty. Gen., Stephen C. Robinson, Sp. Asst. Atty. Gen., Theodore R. Boecker and Bruce Foudree, Asst. Attys. Gen., for appellees.

MOORE, Chief Justice.

Plaintiffs, patients at the Mental Health Institute in Mount Pleasant and the Association for Mental Health, Inc., appeal trial court's judgment dismissing their class action which sought to permanently enjoin defendants from modifying Building 20 at the Institute for use as a medium security correctional facility. We affirm.

Trial of this case extended over a period of seven days. We believe the following is a reasonable summary of the record made below as well as the legislative history and statutes involved.

To assist in alleviating the critical shortage of prison facilities in Iowa, the Second Session of the 66th General Assembly, in June 1976, enacted chapter 1043 (H.F. 1539) which granted to the Governor of the State of Iowa the discretion to select, in consultation with the Commissioner of Social Services, one of three sites for use as a temporary medium security correctional facility. The Act specifically provided that if the Governor did elect to exercise one of these options the capacity of the facility was not to exceed 150 persons and its operations

were limited to two years after the effective date of the Act (July 1, 1976) unless an extension was granted by a subsequent General Assembly. Section 1(5)(b) provided the following as one available option:

"Modification of Building 20 at the mental health institute at Mount Pleasant for use as a medium security correctional facility, and operation of the facility, without discontinuing any of the mental health programs now offered at that institute and without intent on the part of the general assembly to influence or to restrict the scope of the recommendations relative to future utilization, conversion or discontinuation of the state mental institute which the department is required by this Act to prepare; * * *."

After consultation with Kevin Burns, Director of the Iowa Department of Social Services and various other individuals, Governor Robert D. Ray elected to implement the Mount Pleasant option.

The Mental Health Institute at Mount Pleasant is one of four facilities serving respective quadrants of the State. The other three are located at Clarinda, Cherokee and Independence. It is classified as an "acute residential treatment center" and serves a wide variety of patients in this capacity. At trial, the parties stipulated that there are approximately 210 to 240 patients at the Institute. This population includes male and female patients who range in age from children and adolescents to the elderly. Voluntary admissions comprise 38 percent of all these patients. While the Institute is characterized as an "open campus" it does have two closed wards and "passes" are required before patients can leave their wards, circulate on the grounds or visit the Mount Pleasant Community.

The plan ultimately designed by the Department of Social Services in July 1976 entailed appropriating approximately 7½ acres of the 165-acre site and one building, Building 20, for the medium security facility. Building 20 is a fairly large, modern, relatively new structure located on the far right-hand side of the semi-circle of build-

ings as one approaches the facility by the main entrance. The main entrance road leads directly into a parking lot in front of the administrative building. Building 20 was being used primarily for purposes not related to those of the Institute. The area was to be enclosed by a double row of 12-foot high chain link fences, eight feet apart, capped with an 18-inch roll of "razor ribbon wire" across the top. The fences would be situated 300 feet from the nearest mental patient residence. Between the two fences a silent electronic security alarm would be connected to the T.V. surveillance system. These fences would be continuously illuminated at night. Uniformed, armed correctional officers will man 12-foot high security towers and there will be a patrol vehicle around the perimeter of the medium security facility. Additionally, some remodeling was planned to modify Building 20 in such a manner as to accommodate the prisoners.

The two facilities will be separately staffed and the only mental health personnel used by the correctional facility will be the business and personnel manager and staff. There may be some other limited exchange of services, including X-Ray and dental, but nothing has been finalized. However, contact between the patients and prisoners could be minimized or even avoided through use of a tunnel system connecting Building 20 to parts of the Mental Health Institute.

Both Mr. Burns and Calvin Auger, Acting Director of the Bureau of Corrections, testified the type of individual who would be placed at Mount Pleasant would be property offenders with six months or less to serve on their sentences. Unlike as at previous times when some inmates from Fort Madison Penitentiary worked at the Mental Health Institute, it was anticipated the Reformatory at Anamosa will be the sending institution.

When the Department of Social Services moved to implement this plan, on July 27, 1976, plaintiffs filed their petition in six divisions seeking temporary and permanent injunctive relief. Trial commenced on Au-

gust 23, 1976 in Polk County District Court. Plaintiffs called as witnesses several prominent psychiatrists and psychologists who testified the construction of a prison on the same location as a mental health clinic would be detrimental to the "open campus" concept and adversely affect utilization of "milieu therapy" to assist the mental health patients. Defendants' experts took a contrary position and stated they foresaw no such detrimental effect.

The trial court prepared and filed detailed findings of fact and squarely met and decided the issues raised in each division of plaintiffs' petition. Three divisions alleged violation of constitutional rights. The other three raised questions of statutory construction and proper implementation of the statutes involved. The trial court specifically held adversely on each of plaintiffs' six contentions.

In its decree filed September 10, 1976 the trial court denied injunctive relief and dismissed plaintiffs' action. On this appeal plaintiffs have expressly limited their appeal to claimed erroneous holdings including statutory construction and proper implementation of the statutes. Alleged violation of constitutional rights is not pursued on this appeal.

█ I. This action for injunctive relief is a civil suit standing in equity. *City of Des Moines v. Harvey,* Iowa, 243 N.W.2d 606, 610; *Sound Storm Ent., Inc. v. Keefe, In & For Fayette Cty.,* Iowa, 209 N.W.2d 560, 565. Thus our review is de novo. Rule 334, Rules of Civil Procedure. Especially when considering the credibility of witnesses, we give weight to the fact findings of the trial court, but are not bound by them. Rule 344(f)(7), R.C.P; *White v. Board of Review of Polk County,* Iowa, 244 N.W.2d 765, 772; *Helmkamp v. Clark Ready Mix Company,* Iowa, 214 N.W.2d 126, 128.

II. The first of plaintiffs' three propositions raised for reversal asserts the trial court erred when it failed to find implementation of 66 G.A. chapter 1043, section 1(5)(b), (1976 Session) was in conflict with 66 G.A. chapter 139, section 23, (1975 Session). That section, one portion of a comprehensive Act relating to the hospitalization of the mentally ill, sets forth a "Bill of Rights" for hospitalized persons as follows:

"Every person who is hospitalized or detained under this Act shall have the right to:

"1. Prompt evaluation, emergency psychiatric services, and care and treatment as indicated by sound medical practice.

"*        *        *        *        *        *.

"3. In addition to protection of his constitutional rights, enjoyment of other legal, medical, religious, social, political, personal and working rights and privileges which he would enjoy if he were not so hospitalized or detained, so far as is possible consistent with effective treatment of that person and of the other patients of the hospital.  *   *   *."

The crux of plaintiffs' argument is that while chapter 1043 was intended to remedy the overcrowded prison conditions in Iowa it was to do so consistent with the rights of mental patients. They contend the implementation of the Department of Social Services' blueprint modifying Building 20 and the immediate surrounding area is "inconsistent with sound medical practice" and in conflict with the clear intent of the legislature; it thus constitutes an illegal act and cannot stand.

█ In interpreting these statutes we are guided by familiar principles of statutory construction. Of course, the polestar is legislative intent. *Iowa Dept. of Rev. v. Iowa Merit Employ. Com'n.,* Iowa, 243 N.W.2d 610, 614; *Cassady v. Wheeler,* Iowa, 224 N.W.2d 649, 651. Our goal is to ascertain that intent and, if possible, give it effect. *State v. Prybil,* Iowa, 211 N.W.2d 308, 311; *Isaacson v. Iowa State Tax Commission,* Iowa, 183 N.W.2d 693, 695. Thus, intent is shown by construing the statute as a whole. In searching for legislative intent we consider the objects sought to be accomplished and the evils and mischiefs sought to be remedied in reaching a reasonable or liberal construction which will best effect its purpose rather than one which will de-

feat it. *Peters v. Iowa Emp. Security Com'n.*, Iowa, 235 N.W.2d 306, 310; *Iowa Nat. Indus. Loan Co. v. Iowa State, Etc.*, Iowa, 224 N.W.2d 437, 440. However, we must avoid legislating in our own right and placing upon statutory language a strained, impractical or absurd construction. *Cedar Mem. Park Cem. Ass'n v. Personnel Assoc., Inc.*, Iowa, 178 N.W.2d 343, 347.

■ Finally, we note that in construing a statute we must be mindful of the state of the law when it was enacted and seek to harmonize it, if possible, with other statutes relating to the same subject. *Egan v. Naylor*, 208 N.W.2d 915, 918 and citations.

■ Considering chapter 1043 in light of these principles we are persuaded the legislature's express purpose in enacting the statute was to alleviate the overcrowding of our penal institutions. Clearly the legislature was responding, as other legislatures have done, see *Askew v. Schuster*, Fla., 331 So.2d 297, and *Louisiana Ass'n for Mental Health v. Edwards*, La., 322 So.2d 761, to a noticeable and serious security problem due to prisoner concentrations at Anamosa and Fort Madison. Thus, the statute can properly be classified as a specific statute. While related statutes are read in pari materia, if there is a conflict between a general and specific statute, the specific section controls. Code section 4.7; *Shriver v. City of Jefferson*, Iowa, 190 N.W.2d 838, 840; *Goergen v. State Tax Commission*, Iowa, 165 N.W.2d 782, 787; 2A Sutherland on Statutory Construction, § 51.05 at page 315 (4th Ed.).

As applied to the facts herein presented, plaintiffs contend this rule should not be used to restrict or repeal by implication already existing legislation relating to mental health patients. They urge the two statutes are consistent on their face and evidence an intent to protect the patient's rights; it is the particular implementation of the chapter 1043 which is illegal and contrary to this manifested intent.

Several prominent psychiatrists and psychologists in answer to a lengthy hypothetical question opined that the conversion of Building 20 into a medium security correctional facility would be detrimental to the patients in several particulars. Defense counsel timely objected that there was "no adequate foundation based on future contingencies." Trial court overruled each objection. Thus before detailing somewhat the evidence in this regard, we prefatorily note whether such opinion evidence forms a proper basis for trial court's conclusions and our own on this de novo review.

■ We are committed to a liberal rule on the admission of opinion evidence. *Ganrud v. Smith*, Iowa, 206 N.W.2d 311, 314. Generally the admission of such evidence rests largely within trial court's discretion which we will not disturb on appeal absent manifest abuse. *Becker v. D & E Distributing Co.*, Iowa, 247 N.W.2d 727, 733; *Miller v. International Harvester Co.*, Iowa, 246 N.W.2d 298, 302. Of course, as the trier de novo, we should not consider the evidence where the record shows as a matter of law that the witness is unqualified or the facts upon which the opinion is based are not sufficiently stated by the witness. However, normally the evidence is admitted as an opinion which the trier of fact is at liberty to reject. *Miller v. International Harvester Co.*, supra; *Ganrud v. Smith*, supra.

■ We believe in the instant case the opinion of the experts can be properly considered as evidence. All the psychiatrists and psychologists have extensive educational and professional qualifications. In particular we note Dr. Jack Weinberg, the President of the American Psychiatric Association and Chief Administrator of Illinois Mental Health Institutes, has had extensive training and experience in excess of 37 years. The facts upon which these experts based their opinion were either in evidence regarding the proposed physical layout or were stipulated by the parties at an early stage of the proceeding. While it is true that the opinion given concerned a future event we believe the trier of fact in such a situation can choose to give as much or as little weight to the opinion as it deems entitled.

Plaintiffs' witnesses testified that construction of the medium security correctional facility on the site of the Mount Pleasant MHI would adversely affect all classes of patients in several particulars. Dr. Weinberg testified there would be a "double stigma" caused by patients perceiving themselves as both institutionalized patients and prisoners. Drs. Herbert Nelson and John H. Hege testified construction of the security fences and towers could seriously disrupt the "open campus" environment at Mount Pleasant and interfere with effective "milieu therapy" which emphasizes absence of restraints on patients, freedom of movement and the use of a patient's total surroundings to effect a solution for his particular problem.

It was admitted that even in "open campus" settings there are closed areas and sometimes even fences. Dr. Patrick Murphy opined that he believed certain patients, especially females, could be subject to verbal and overt sexual harassment by the inmates. Dr. Jules Masserman testified as to the overall detrimental effect of the proposed project on good mental patient care and suggested it would be harder to secure good staff personnel to work under these backward conditions. Monsignor Timothy J. Gannon, a professor at Loras College in Dubuque, stated the Mount Pleasant project was a "giant step backward" in mental health care in Iowa. There was some testimony that visitation would be more difficult in such a setting. Other testimony was received which indicated voluntary admission would be reduced.

Defendants predictably also presented expert testimony on the effects of the medium security correctional facility on the Mount Pleasant MHI. Dr. Loeffelholz, Oakdale Clinical Director, testified that any negative effect would be "negligible". Dr. Rudolfo L. Aldana, clinical psychiatrist at Mount Pleasant, also stated any negative effect would be "negligible". Aldana explained that even before the medium security project there were closed wards, off-limit areas and restrictions on the patients' day to day activities. Dr. Robert Jack Eardley, Chief Psychiatrist at the medical center for federal prisoners at Springfield, Missouri, stated while ideally he would build no fence or towers he did not believe the effect would be detrimental to the mental health patients. Dr. James Lyons, Staff Psychiatrist at Oakdale, concurred in this view.

We believe that after reviewing the whole record we agree with Nicholas J. Grunsweig, Acting Director of the Division of Mental Health Resources, Department of Social Services, who in response to a question proposed by counsel stated, "You are asking me about possibilities and probabilities, and that in itself is a nondemonstrated effect."

■ We agree with the trial judge who determined the record did not support a finding that there was a conflict between the two statutes. In particular we are in complete agreement with this portion of his findings:

"Unless one is careful and really analyzes the situations, as they are expected to exist in these two facilities, one can come to the unwarranted conclusion that mental health patients are constantly wandering the grounds of the mental health institute, and likewise that prisoners at the correctional facility are spending all of their time in the correctional facility.

"To the contrary, the record made allows a finding that both correctional facility prisoners and mental health institute patients are, for a considerable part of the day, involved in rehabilitative programs or engaged in constructive activities that are not of such a nature as would cause or even permit the association and contact that has posed such a threat of impending doom to these plaintiffs."

We are impressed that the members of the Department of Social Services are doing their utmost to allocate limited resources available in the way to make the most minimum infringement upon either the rights of mental health patients or prison-

ers under the present emergency situation existing in Iowa.

Assuming arguendo there is a "conflict" in the implementation plan of the facility at Mount Pleasant with the intent to protect mental health patients' rights, we would not reverse on that basis. First, since 66 G.A. chapter 1043 (1976 Session) is a specific statute dealing with the overcrowded prisons it prevails over the earlier general statute relating to hospitalized persons, that being 66 G.A. chapter 139 (1975 Session).

Additionally, chapter 1043, as the most recent Act of the legislature, prevails. Code section 4.8; *Peters v. Iowa Emp. Security Com'n,* supra. Also see *Peters v. Iowa Employment Sec. Commission,* Iowa, 248 N.W.2d 92, 95. In 1976 the Supreme Court of Florida was called upon to review a similar situation to the one now confronting us and used this rationale in upholding a statute analogous to chapter 1043 against constitutional challenge. *Askew v. Schuster,* Fla., 331 So.2d 297. Florida too had a "Bill of Rights" comparable to 66 G.A. chapter 139, section 23 (1975 Session). The legislature, as here, was confronted with a critical shortage of correctional facilities and passed legislation similar to 66 G.A. chapter 1043 (1976 Session) to assist in solving this problem. The Florida statute provided for conversion of a portion of a state mental hospital into a medium security prison. Patients of the hospital brought a class action seeking to enjoin implementation of this project. In reversing trial court's ruling which had granted the injunction the Florida Supreme Court stated at page 300:

"Absent a violation of due process or a specific constitutional guarantee, courts cannot substitute their judgment for that of the Legislature. * * *.

"Although we find no inconsistency between the Act in question and Sections 394.457(8) and 394.459, Florida Statutes, [analogous to Ch. 139] we restate the fundamental rule of statutory construction which would be applicable here were the statutes inconsistent, that the last expression of legislative will prevails. * * *.

Accordingly, we find that Section 945.025(3), Florida Statutes, is constitutional and as the last expression of the Legislature's will prevails over Sections 394.457(8) and 394.459, Florida Statutes. * * *."

We find this reasoning persuasive authority and adopt it in this instance.

Plaintiffs in arguing this issue have rather clearly lost sight of the respective roles of the legislative and judicial branches of our government. The arguments they present here essentially challenge the wisdom of selecting the Mount Pleasant Mental Health Institute as the site for the medium security correctional facility. As such, these arguments surely have a place in legislative debate prior to enactment. However, the judicial branch of our government has no power to determine whether legislative Acts are wise or unwise, nor has it the power to declare an Act void unless it is plainly and without doubt repugnant to the Constitution. *Keasling v. Thompson,* Iowa, 217 N.W.2d 687, 690; *Farrell v. State Board of Regents,* Iowa, 179 N.W.2d 533, 537; *Green v. City of Mt. Pleasant,* 256 Iowa 1184, 1196, 131 N.W.2d 5, 13–14. In fact so long as there is no constitutional defect, the legislature may enact any law, reflecting whatever social policy it desires. *Peel v. Burk,* Iowa, 197 N.W.2d 617, 619. Plaintiffs' first argued proposition is untenable.

III. Plaintiffs next contend the trial court erred when it failed to find defendants' implementation of 66 G.A. chapter 1043, section 1(5)(b) (1976 Session) was in conflict with their existing statutory rights as set forth in Code section 226.10. That section, one portion of chapter 226 which establishes State Mental Institutes in this State in Mount Pleasant, Independence, Clarinda and Cherokee, provides:

"The several patients, according to their different conditions of mind and body, and their respective needs, shall be provided for and treated with equal care."

Their argument is that this statute mandates equal treatment of patients.

The facts and authorities set out in division II clearly demonstrate plaintiffs' second argued proposition is without merit.

It is to us evident the distinction made between the Mount Pleasant facility and the three other mental health institutes bears a reasonable relationship to a state legislative objective sought to be accomplished through implementation of 66 G.A. chapter 1043 (1976 Session). The legislature has acted in a rational way to alleviate overcrowding at the state correctional institutions at Anamosa and Fort Madison. It has made a distinction between the facilities as a means of dealing with an intolerable situation. The evidence presented did not intimate the mere construction of the medium security facility will necessarily change the program at Mount Pleasant except to require certain programs be moved to Building 18 and create another area which operates in effect as an off-limits locked ward.

▮ IV. Plaintiffs' final contention is that trial court erred when it failed to find that defendants' implementation of 66 G.A. chapter 1043 (1976 Session) through modification of Building 20 and operation of the medium security correctional facility was in violation of the enabling legislation, subsection 1(5)(b), in that the medium security correctional facility may be constructed only if it can be done "without discontinuing any of the mental health programs now offered at that facility." Plaintiffs' position is that any modification or diminishment of an existing mental health program at Mount Pleasant concerning even one present or future mental health patient constitutes "discontinuance" of that program and thus is violative of the enabling legislation and illegal.

Thus our task is to construe the meaning of the word "discontinue" as employed in this statute and then determine if, under the facts presented, whether any program was "discontinued" at Mount Pleasant MHI.

▮ In construing a statute we attempt to give it a sensible, practical, worka-

ble and logical construction. *Lynch v. Bogenrief*, Iowa, 237 N.W.2d 793, 796; *Matter of Estate of Bliven*, Iowa, 236 N.W.2d 366, 369. While the plain and obvious meaning of a statute is always preferred, *Becker v. Board of Education*, 258 Iowa 277, 285, 138 N.W.2d 909, 913; *Consolidated Freightways Corp. v. Nicholas*, 258 Iowa 115, 119–120, 137 N.W.2d 900, 904, the manifest intent of the legislature will prevail over the literal import of the words used. *Northern Natural Gas Company v. Forst*, Iowa, 205 N.W.2d 692, 694–95; *Spencer Pub. Co. v. City of Spencer*, 250 Iowa 47, 51, 92 N.W.2d 633, 635. In other words, the subject matter, effect, consequence, and the reason and spirit of the statute must be considered, as well as words, in interpreting and construing its meaning. *Northern Natural Gas Company v. .Forst*, supra; *Dobrovolny v. Reinhardt*, Iowa, 173 N.W.2d 837, 840.

The word "discontinue" has been defined by the Texas Court of Civil Appeals as "to put an end to; to cause to cease; to cease using; to give up; to abandon or terminate by a discontinuance." *Jones v. Dumas Development Co.*, Tex.Civ.App., 229 S.W.2d 936, 940. In doing so the Texas court cites and quotes Webster's New International Dictionary, Second Edition. We believe this definition may be properly used here.

We now briefly consider each of the matters raised by plaintiffs in their brief which they argue were or will be "discontinued." Their major argument is that since modification of Building 20 will result in a 7 1/2 acre area of the 165 acre Mental Health Institute being classified as "off-limits" and restricted to the mental health patients that this necessarily "discontinues" the "open campus" concept and seriously damages the ongoing "milieu therapy." We reject this view for several reasons. First, even appellants' experts testified that there may be restricted, closed areas in use in a hospital facility even though it operates under the "open campus" theory. The Mount Pleasant facility prior to the modification plans had two such closed or restricted areas. "Passes" have been required to gain access to different parts of the grounds. While

there will be an additional restricted area created by establishment of the temporary medium security facility we do not believe it will necessarily follow that the "open campus" concept will be "discontinued."

The evidence shows fences are located on the grounds of both the Vermont State Hospital and on the grounds of the Oregon State Hospital at Salem. Both operate under the "open campus concept." We believe the Mount Pleasant Mental Health Institute can also. The fact the location of a baseball diamond will be changed does not mean the "therapeutic milieu" will be so inalterably changed as to seriously affect treatment. On the basis of the record before us, we conclude the "open campus" concept will not be "discontinued" by implementation of chapter 1043.

Plaintiffs' other main argument is that various programs at the MHI will be discontinued by implementation of chapter 1043. We first note that the "loss of supportive services" is not per se loss of mental health programs. As the trial court noted during the testimony of Coen Plasberg, Superintendent of the MHI, while the MHI shared in and benefited from the use of Area Education Agency No. 16, Southeastern Area Community College and the Media Center of Area 16, these services were utilized by the entire population of this service area. Building 20 thus served as a warehouse for various agencies not directly connected with the Mount Pleasant MHI. In addition, while the programs have been moved to Burlington and Fort Madison, they are still available though less accessible to the patients.

Neither do we conclude from the record before us that because Building 20 is no longer available for vocational rehabilitation programs that these will be "discontinued." Both Mr. Plasberg and John Foote, Director of Vocational Rehab programs at the MHI testified that there was vacant space in Building 18 for such use. Foote also stated there was some space in the main administration building.

We briefly comment on and reject two other arguments made by plaintiffs. The fact that there was some expert testimony which indicated certain psychiatrists would not recommend their patients voluntarily admit themselves to Mount Pleasant, (defendants' experts testified contra) does not mean the voluntary admittance program is from this time forward "discontinued." Certainly a psychiatrist may make a judgment not to send this or that patient to a particular. facility for whatever reason but this is not "discontinuance" of a program at the institution itself. That program is still there, ready to be utilized by persons in need of the "acute residential treatment center" for assistance with their problems.

Finally, we reject plaintiffs' argument that because one individual was dissatisfied and resigned from the institution that there will be a wholesale reduction of competent staff at the Institute.

In summary, we agree with trial court's conclusion on this issue:

"In this court's opinion, the factual record presented is not in any way persuasive to this court to the effect that the Governor's selection of alternative 1(5)(b) Modification of Building 20 at the Mental Health Institute at Mount Pleasant, will either have the present or future effect of discontinuing any of the mental health programs offered at that institution."

V. After review of the testimony taken over a seven-day period which consists of over 1200 pages of transcript and examining and studying numerous exhibits including blueprints, pictures and an aerial "blow-up" of the Mount Pleasant Mental Health Institute site and after considering all arguments of the parties, we agree with the judgment entered by the lower court.

AFFIRMED.